**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BROCK LUNSTRUM, Individually and on Behalf of All Others Similarly Situated, | Case No.  1:25-cv-5659 |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **CLASS ACTION** |
| CENTENE CORPORATION, SARAH M. LONDON, and ANDREW LYNN ASHER, | <u>Demand for Jury Trial</u> |
| Defendants. |  |

Plaintiff Brock Lunstrum ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Centene Corporation ("Centene" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Centene's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Centene securities between December 12, 2024 to June 30, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Centene's expected revenue guidance and adjusted diluted EPS for fiscal year 2025. Defendants' statements included, among other things, confidence in the Company's enrollment and morbidity rates, as well as strong retention rates in Centene's Medicare business.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Centene's enrollment and morbidity rates. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Centene's securities at artificially inflated prices.

4.      Investors began to question the veracity of Defendants' public statements on July 1, 2025, when Centene issued a press release withdrawing 2025 guidance. Particularly, following an analysis of the 2025 Health Insurance Marketplace, Centene's overall market growth across 22 states, or 72% of the Company's marketplace membership, was lower than expected. In pertinent part, the Company stated that this preliminary analysis resulted in a reduction of its previously issued guidance to approximately $1.8 billion or an adjusted diluted EPS of $2.75.

5.      Investors and analysts reacted immediately to Centene's revelation. The price of Centene's common stock declined dramatically. From a closing market price of $56.65 per share on July 1, 2025, Centene's stock price fell to $33.78 per share on July 2, 2025, a decline of 40.4%.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Centene common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Centene is attached hereto.

12.     Centene Corporation is Delaware corporation with its principal executive offices located at 7700 Forsyth Boulevard, St. Louis, Missouri 63105. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "CNC."

13.    Defendant Sarah M. London ("London") was, at all relevant times, the Chief Executive Officer and Director of Centene.

14.    Defendant Andrew Lynn Asher ("Asher") was, at all relevant times, the Chief Financial Officer of Centene.

15.    Defendants London and Asher are sometimes referred to herein as the "Individual Defendants." Centene together with the Individual Defendants are referred to herein as the "Defendants."

16.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Centene's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Centene is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Centene under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19.     Centene describes itself as a leading healthcare enterprise that is committed to helping people live healthier lives. According to Centene, the Company takes a local approach – with local brands and local teams – to provide fully integrated, high-quality and cost-effective services to government-sponsored and commercial healthcare programs, focusing on under-insured and uninsured individuals. Centene offers affordable and high-quality products to more than 1 in 15 individuals across the nation, including Medicaid and Medicare members (including Medicare Prescription Drug Plans) as well as individuals and families served by the Health Insurance Marketplace.

20.     In 2024, the Company operated in four segments: Medicaid, Medicare, Commercial, and Other.

- **Medicaid -** includes the Temporary Assistance for Needy Families (TANF) program; Medicaid Expansion programs; the Aged, Blind or Disabled (ABD) program; the Children's Health Insurance Program (CHIP); Long-Term Services and Supports (LTSS); Foster Care; Medicare-Medicaid Plans (MMP), which cover beneficiaries who are dually eligible for Medicaid and Medicare; and other state-based programs.

- **Medicare -** includes Medicare Advantage, Medicare Supplement, Dual Eligible Special Needs Plans (D-SNPs) and Medicare Prescription Drug Plans (PDP), also known as Medicare Part D.

- **Commercial -** includes the Health Insurance Marketplace product along with individual, small group and large group commercial health insurance products.

- **Other -** includes our pharmacy operations, Envolve Benefit Options' vision and dental services, clinical healthcare, behavioral health, the TRICARE program, and corporate management companies, among others.

***The Defendants Materially Misled Investors Concerning Centene's***

***Marketplace Enrollment and Medicare Member Retention***

<u>December 12, 2024</u>

21.    On December 12, 2024, Centene published a press release announcing 2025 guidance. Defendant London stated, in pertinent part:

> Centene is a mission-driven organization, dedicated to delivering high quality outcomes for more than 28 million members, many of whom are among the nation's most medically complex and historically underserved populations. Over the last three years we improved our core operations and invested in the experience of our customers and providers, all while delivering on our financial commitments. This morning, we are reiterating our 2024 adjusted diluted EPS guidance of greater than $6.80. Additionally, we issued 2025 adjusted diluted EPS guidance of greater than $7.25, representing more than 6% year-over-year growth.

22.    Also on December 12, 2024, Centene hosted Analyst/Investor Day, wherein Defendants provided detailed 2025 guidance. Defendant Asher stated, in relevant part:

> Let's start with the basics. Stability in earnings power in the face of unprecedented headwinds provide Centene with a solid jump off point for 2025 and beyond. As you've likely seen by now, we've issued 2025 adjusted EPS guidance of greater than $7.25, representing more than 6% year-over-year growth compared to this year's current outlook. We are using today as an opportunity to set the floor for 2025 guidance, inclusive of an expectation for a 3% to 4% Medicaid composite rate adjustment.
>
> *        *        *
>
> Now let's move to why you joined us today: the future. Starting with the first ingredient you need to drive earnings growth: revenue growth. We are expecting 7.6% growth at the midpoints, $11 billion of additional premium revenue compared

to 2024 for a 2025 guidance midpoint of $155 billion of premium and service revenue.

*     *     *

What does all of this add up to? Initial 2025 adjusted diluted EPS guidance of greater than $7.25. You can see 2025 guidance elements summarized here, including our first year with a diluted share count starting with a 4. Note also an adjusted effective tax rate of 22% to 23%, which is down a little from 2024, primarily driven by a state tax benefit expected to be realized in Q4 of 2025.

*February 4, 2025*

23.     On February 4, 2025, Centene published a press release detailing fourth quarter and full year 2024 fiscal results. As part of the press release, the Company increased its previously issued guidance. In pertinent part:

**Outlook**

The Company is increasing its 2025 premium and service revenues guidance range by $4.0 billion to a range of $158.0 billion to $160.0 billion to reflect the following expectations:

>  •outperformance in our PDP annual enrollment resulting in an additional $1.5 billion premium revenue,
> •outperformance in our Medicare Advantage annual enrollment resulting in $1.0 billion of additional premium revenue, and
> •$1.5 billion of additional Medicaid premium revenue due to a program change adding behavioral health coverage in one of our state contracts.

The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than $6.19 and its 2025 adjusted diluted EPS guidance floor of greater than $7.25.

24.     The same day, Centene hosted an earnings call detailing the Company's increased 2025 guidance. Defendant London stated, in relevant part:

Strong results that demonstrate the durability of our earnings power and position the company to execute against our strategic goals in 2025. Driven by better-than-expected results during the Medicare annual enrollment period and a program expansion in Medicaid, we are lifting our full year 2025 revenue guidance by $4 billion.

7

Our outlook for full year 2025 adjusted diluted EPS remains unchanged at greater than $7.25, and we are pleased with the trajectory we are on at this early stage in the year. To that end, let's talk about the opportunities in each of our business lines and how we are positioned for 2025.

25.    Also during the earnings call, Defendant Asher reaffirmed the increased guidance for 2025, in pertinent part:

So we are increasing our consolidated 2025 premium and service revenue guidance range by $4 billion to a range of $158 billion to $160 billion of premium and service revenue. This is good news as you think about the long-term earnings power of Centene. At this very early point in the year, we are reiterating our 2025 adjusted diluted EPS guidance floor of greater than $7.25. Quick comment on 2026 Medicare rates. The preliminary percentage rate change for us is in the low to mid-3s, including the positive impact of STARS from the work we did in 2023 and 2024.

*April 25, 2025*

26.    On April 25, 2025, Centene published a press release detailing the Company's first quarter 2025 financial results, as well as providing increased guidance. Defendant London stated, in pertinent part:

Our first quarter results demonstrate the resiliency of Centene's platform and the progress we are making as an organization while navigating a dynamic policy landscape. We are pleased to reiterate our full year 2025 adjusted diluted earnings per share outlook of greater than $7.25 and continue to see attractive opportunities to grow from the strength of our core businesses in the years to come.

27.    Also as part of the press release, Centene provided updated guidance for fiscal year 2025, in relevant part:

**Outlook**

The Company is increasing its 2025 premium and service revenues guidance range by $6.0 billion to a range of $164.0 billion to $166.0 billion to reflect the following expectations:

•$5.0 billion of additional Marketplace premium revenue due to outperformance in enrollment throughout the first quarter; and
•outperformance in the Medicare Advantage annual enrollment period resulting in $1.0 billion of additional premium revenue.

The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than $6.19 and its 2025 adjusted diluted EPS guidance floor of greater than $7.25.

The Company's annual guidance for 2025 is as follows and will be discussed further on our conference call:

| | Full Year 2025 |
| --- | --- |
| GAAP diluted EPS | > $6.19 |
| Adjusted diluted EPS (1) | > $7.25 |

1) A full reconciliation of adjusted diluted EPS is shown in the Non-GAAP Financial Presentation section of this release.

| | Full Year 2025 | | | |
| --- | --- | --- | --- | --- |
| | Low | | High | |
| Total revenues (in billions) | $ | 178.5 | $ | 181.5 |
| Premium and service revenues (in billions) | $ | 164.0 | $ | 166.0 |
| HBR | | 88.9 % | | 89.5 % |
| SG&A expense ratio | | 7.7 % | | 8.2 % |
| Adjusted SG&A expense ratio (2) | | 7.7 % | | 8.2 % |
| Cost of services expense ratio | | 88.2 % | | 88.8 % |
| Effective tax rate | | 21.5 % | | 22.5 % |
| Adjusted effective tax rate (3) | | 22.0 % | | 23.0 % |
| Diluted shares outstanding (in millions) | | 491.0 | | 494.0 |

2) Represents a non-GAAP financial measure. Adjusted SG&A expense ratio excludes acquisition and divestiture related expenses of approximately $550 thousand.

3) Represents a non-GAAP financial measure. Adjusted effective tax rate excludes income tax effects of adjustments of approximately $165 million to $168 million.

28.    Later that same day, Centene hosted an earnings call detailing the Company's first quarter 2025 financial results and updated guidance. Defendant Asher stated in pertinent part:

*On our entire Medicaid book, we are projecting a full year composite rate increase at 4% plus.*

*Medicare Advantage and PDP both outperformed on membership. We retained more membership than expected during the Medicare Advantage open enrollment period, which bodes well for long-term earnings power. This is*

*contributing $1 billion to our 2025 premium and service revenue guidance increase. PDP ended the quarter at 7.9 million members, strong growth from 2024.*

Medicare segment HBR was 86.3% in the quarter, which, as we covered in past discussions, is expected to follow an inverted slope line compared to 2024 due to the Inflation Reduction Act program changes. So a lower Medicare segment HBR and higher earnings early in the year and a higher HBR and lower earnings later in the year.

Within the Medicare segment, both Medicare Advantage and PDP businesses were on track in the quarter. And you'll see an intra-year increase in the Medicare Advantage PDR, premium deficiency reserve, that was planned for and is solely related to the sloping of earnings during 2025. So no change in our view of Medicare Advantage earnings for 2025.

Commercial membership was very strong in the quarter, not just during open enrollment for 1/1, but also in February and March. Q1 Commercial segment HBR at 75.0% was a little higher than last year's 73.3%, driven by 1.9 million new Marketplace Members in Q1. These members are utilizing a little more than last year's new members. But because it's so early in the year, we are not yet recognizing a matching offset for risk adjustment. We'll know more when we get the first Wakely file in late June, early July.

*Given top line performance in Q1, and even as we forecast net membership attrition throughout the rest of the year, we are adding $5 billion of premium revenue to 2025 guidance related to Marketplace.*

\*        \*        \*

*Looking at the full year, we are pleased to reiterate greater than $7.25 of adjusted diluted EPS. As you've heard, the theme of the quarter was strong premium revenue growth and stronger-than-expected membership. Accordingly, we are increasing premium and service revenue guidance to a midpoint of $165 billion, up from $159 billion.*

[Emphasis added].

29.    During the question-and-answer segment of the April 25, 2025 earnings call,

Defendants London and Asher fielded questions from analysts, in relevant part:

<Q: Ann Kathleen Hynes - Mizuho Securities USA LLC – Analyst> I know you gave original guidance from Medicaid rates in the second half. You assumed, I

believe, around the 2.5% rate increase. Is that still the case? And do you have increased visibility on how those negotiations are going for the second half? That would be my first question.

And then maybe secondly, with Medicaid besides the flu, is anything running harder than you expected when you -- versus when you gave original guidance?

<A: Defendant London> Thanks, Ann, for the question. So composite rate for the full year, we're now seeing at mid-4s, and the rate negotiations relative to upcoming, so think about the 7/1 cohort, which is the next cycle, we will start to get visibility into that as we get in -- later into Q2. So more to come on that front. But as you heard me say, I think we're seeing good continued momentum in our discussions with state partners. And the fact that as we roll forward, we have further completion data behind us in terms of the acuity patterns that started to emerge in Q2 right around this time last year. So that helps bolster the conversation in terms of supporting the actuarial calculus, and I think helps in conversations with the state. So obviously, looking to that 7/1, 9/1 and 10/1 cohort to contribute to the back half of the year.

And then I think you asked about Medicaid utilization beyond flu. And so we continue to see largely the same themes. But Drew, maybe you want to click into a few of those.

<A: Defendant Asher> Yes. No, clearly, we had the flow of $130 million in Q1. That's transitory. Behavioral health continues to be a trend item. We've mentioned that probably for the last 6 quarters. We've got initiatives to tackle that and working with our state partners, things like applied behavioral analysis. I guess, no surprise coming out of the pandemic era. There's pockets of home health. We've mentioned that before, things like attended services that where we can tighten UM, do some audits. And then probably the area of uptick is high-cost drugs. An example might be Elevidys, which curiously is a $3.2 million single-treatment drug that if you read the JAMA articles, it's questionable in terms of the efficacy. And looking at -- we're all trying to keep health care affordable. That seems quite extreme for a cost of a single treatment for a newly approved drug last year. So that's an area of uptick that effectively is on the back of the federal and state governments and us as a payer.

So that's one thing we're watching, and we thought about that as we lifted the Medicaid HBR into the mid- to high 90-ones from our previous guidance.

*      *      *

<Q: Hua Ha – Robert W. Baird & Co. – Analyst> Regarding the exchanges. So firstly, I'm having a little bit of trouble bridging to your expected $5 billion of additional revenue. If I take your roughly 0.5 million more lives, 550 revenue PMPM, I'm still getting to only about $3 billion to $4 billion. And I know you're

still assuming the same in your attrition cadence. So I was wondering if you could help me bridge that gap in case I'm missing something.

And then I understand you're treating incremental exchange growth in 1Q to be lower margins. It sounds like you could be conservatism, but wondering what exact margin level you're assuming on those lives. And lastly, very quickly, when you hear the most bearish concerns about the magnitude of potentially millions of fraudulent lives and the exchanges and the risk that might pose to you next year. I'm just curious to hear your general thoughts overall level of confidence that this most bear-case scenario that's rolling around won't actually happen.

<A: Defendant London> Yes. Thanks for the question. So let me start with the last piece of that and we can sort of work our way backwards. There's obviously been a lot of concern about the idea that there is sort of ramp in broker fraud or ghost members in the population, I think it's important to note that the movement to drive additional program integrity, which was understandably loosened during the pandemic, started more than a year ago and a lot of the program integrity measures that are being put in place are things that we've operated with in the past, which means we have baseline and benchmark data around what some of these rates should be.

We were a pioneer in terms of implementing the agent of record lock. Back in January of last year we introduced that. We were the first to put it in place. And we're seeing the benefit of that. And we track very closely the levels of complaints that come in from members or where there are broker issues throughout the year and can understand whether we're seeing upticks in that and anything different than what we would expect.

So I think we have accounted for things like the failure to reconcile in our full year outlook. Again, the timing of that has shifted. But the team is pretty experienced at understanding the dynamics in the membership. Obviously, the new utilizers that we have where we're seeing utilization is frankly a good sign because it's hard for ghosts to utilize the system. And we feel like we have all the data we need to account for what -- how this will play out both through the remainder of this year and in 2026.

I think you asked about sort of the level of margin for the new member cohort. Overall, we still expect to be in the 5% to 7.5% margin range for Marketplace. And as I said, we've encountered for a continuation of the level of utilization we're seeing in that new member base. In the full year outlook, our renewal members are as expected.

And then...

<A: Defendant Asher> Yes, then on your first question, the -- so we put up $10.1 billion of commercial premium in Q1. And if you do the math on our guidance, it's

$39 billion for the full year. So we are accounting for attrition throughout the rest of the year to end up in the high 4s. So that sort of hangs together.

30.    The above statements in Paragraphs 21 to 29 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also touting enrollment rates and low morbidity. In truth, Centene's optimistic reports and promises regarding the Company's inflated guidance, fell short of reality when a preliminary analysis of over two-thirds of Centene's marketplace share showed lower-than-anticipated enrollment and increased aggregate market morbidity.

### *The Truth Emerges*

#### *July 1, 2025*

31.    On July 1, 2025, Defendants issued a press release withdrawing the Company's previous 2025 GAAP and adjusted diluted earnings per share (EPS) guidance. The press release stated, in pertinent part:

**Marketplace 2025 Risk Adjustment Update**

The Company recently received and analyzed its first view of 2025 industry Health Insurance Marketplace (Marketplace) data from Wakely, an independent actuarial firm, covering 22 of Centene's 29 Marketplace states, and representing approximately 72% of the Company's Marketplace membership. This data is submitted to Wakely by most Marketplace insurance carriers.

Based upon the Company's preliminary interpretation of the data and discussions with Wakely, the overall market growth in the 22 states is lower than expected and the implied aggregate market morbidity in those states is significantly higher than, and materially inconsistent with, the Company's assumptions for risk adjustment revenue transfer used in the preparation of its previous 2025 consolidated guidance.

***The Company's preliminary analysis of the 22 states results in a reduction to its previous full year net risk adjustment revenue transfer expectation by a preliminary estimate of approximately $1.8 billion which corresponds to an adjusted diluted EPS impact of approximately $2.75. This preliminary estimate***

*includes a projection of the remaining eight months of 2025 and is based on 2025 paid claims through April 30 from Wakely for the 22 states, as well as the Company's membership estimates and morbidity trend estimates for both its members and the aggregate market, calculated by state.*

The Company does not have information or estimates for its remaining seven Marketplace states, but anticipates, due to the morbidity trends observed in the 22 states, an additional reduction to its net risk adjustment revenue transfer expectation with a corresponding adjusted diluted EPS impact.

Regarding the 2026 Marketplace plan year, the Company has commenced the process of refiling 2026 Marketplace rates to reflect a higher projected baseline of Marketplace morbidity than previously expected. The Company currently expects to be able to take corrective pricing actions for 2026 in states representing a substantial majority of its Marketplace membership.

[Emphasis added].

32.    Investors and analysts reacted immediately to Centene's revelation. The price of Centene's common stock declined dramatically. From a closing market price of $56.65 per share on July 1, 2025, Centene's stock price fell to $33.78 per share on July 2, 2025, a decline of 40.4%.

33.    A number of well-known analysts who had been following Centene lowered their price targets in response to Centene's disclosures. For example, on July 2, 2025, Barclays decreased its price target for Centene 31%, dropping to $45 from $65 in a report titled "*CNC Withdraws 2025 Guidance In Early Sign of ACA Marketplace Spiral.*"

34.    Similarly, CFRA, while considerably reducing their price target from $48 to $37, cautioned:

We cut our 2025 EPS view to $4.55 from $7.30 and keep 2026's at $7.91. CNC withdrew its 2025 guidance after reviewing new actuarial data that covers ~72% of CNC's Marketplace membership across 22 states. Centene now expects overall market growth to be lower and implied aggregate market morbidity in these states is significantly higher than CNC's assumptions for risk adjustment revenue transfer used in its previous guidance. From these 22 states, CNC sees a disconnect of $1.8B, which corresponds to an adj. EPS impact of $2.75. We note CNC has a marketplace business in 29 states total, and anticipate the remaining seven states will show similar morbidity trends. This could reduce CNC's net risk adjustment revenue transfer expectations, and therefore EPS expectations, further.

35.     Analogously, Guggenheim published a report calling Centene's news a "tough update," stating in pertinent part:

> Centene withdrew its 2025 guidance following a material anticipated HIX risk adjustment revenue shortfall and higher Medicaid cost trend, although favorable MA/PDP performance and likely SG&A cuts partially offset. Our back-of-the-envelope math suggests a $2.50-$3.00 EPS range for 2025 now (vs. previous guidance $7.25+), contemplating estimated negative impacts of ~$3.80 from HIX risk adjustment and ~ $1.50-$2.00 from Medicaid trend, perhaps offset by a favorable $1+ on MA/PDP upside and SG&A savings. For HIX, CNC noted an ability to potentially partially offset for the vast majority of its HIX book in 2026 via increased pricing, although rate request data we've analyzed so far suggests CNC had already requested mid-to-high teens rate growth for 2026 prior to yesterday's announcement. At issue, however, is how low CNC undershot its risk transfer position vs. competitors, and if this was simply a CNC mismodeling issue or if acuity is significantly higher across the rest of CNC's markets, which could have negative read-throughs to MOH, ELV, and CI in our coverage given relative HIX footprints. Nonetheless, combined with major market exits from competitors, and a lack of enhanced HIX subsidy extension already putting pressure on HIX risk pools, the announcement underpins even greater uncertainty around the HIX market for 2026. Additionally, continued cost trend pressures in Medicaid (already flagged by ELV) paint a difficult picture for near-term Medicaid earnings without absolute guarantees that actuarial sound rate catch-ups across states could be obtained in a timely manner. While better-than-expected performance in MA and PDP may provide some offsets, and CNC can look to reprice its HIX book in 2026, the updates leave us incrementally cloudy on the 2026 set-up. Despite a historically low valuation (~6.7x our current 2026E EPS), we are not surprised to see the stock trading down significantly (20%+) post-market on the updates. Maintain NEUTRAL rating.

36.     The fact that these analysts, and others, discussed Centene's shortfall and the Company's surprise slash to its previously-issued guidance, suggests the public placed significant weight on Centene's prior statements and outlook. The frequent, in-depth discussion of Centene's 2025 guidance confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

37.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that

artificially inflated the price of Centene's common stock and operated as a fraud or deceit on Class Period purchasers of Centene's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Centene's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Centene's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

38.     Centene's stock price fell in response to the corrective event on July 1, 2025, as alleged *supra*. On July 1, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Centene's forecasting processes and growth guidance.

39.     In particular, on July 1, 2025, Centene withdrew its previously issued guidance citing low enrollment and high morbidity following analysis across 22 of the Company's 29 marketplace states.

### *Presumption of Reliance; Fraud-On-The-Market*

40.     At all relevant times, the market for Centene's common stock was an efficient market for the following reasons, among others:

(a)     Centene's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     Centene communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Centene was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Centene was reflected in and incorporated into the Company's stock price during the Class Period.

41.     As a result of the foregoing, the market for Centene's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Centene's stock price. Under these circumstances, all purchasers of Centene's common stock during the Class Period suffered similar injury through their purchase of Centene's common stock at artificially inflated prices, and a presumption of reliance applies.

42.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

43.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in

enrollment and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

44.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

45.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Centene who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Centene's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

47.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Centene's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Centene or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of April 23, 2025, there were 497,603,000 shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

48.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Centene;

(c)      whether the Individual Defendants caused Centene to issue false and misleading financial statements during the Class Period;

(d)      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)      whether the prices of Centene's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **COUNT I**

### ***Against All Defendants for Violations of***

### ***Section 10(b) and Rule 10b-5 Promulgated Thereunder***

52.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Centene common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Centene's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Centene's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

56.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Centene's internal affairs.

58.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Centene's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Centene's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Centene's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of

the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

59.     During the Class Period, Centene's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Centene's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Centene's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Centene's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

62.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Centene's misstatements.

64.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Centene which had become materially false or misleading.

65.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Centene disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Centene to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Centene's common stock.

66.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same

to cause Centene to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.    By reason of the above conduct, the Individual Defendants and/or Centene are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: July 9, 2025

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

_/s/ Adam M. Apton_
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*